**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| Ratliff CPA Firm, PC, a South Carolina Professional Corporation, individually and on behalf of a class of similar situated businesses and individuals,<br><br>Plaintiff,<br><br>vs.<br><br>First-Citizens Bank & Trust Company and DOES 1 through 100, inclusive,<br><br>Defendants. | Civil Action No.: **2:20-cv-2041-BHH**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. DECLARATORY RELIEF**<br><br>**2. BREACH OF CONTRACT, THIRD-PARTY BENEFICIARY**<br><br>**3. VIOLATION OF SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**<br><br>**4. UNJUST ENRICHMENT**<br><br>**5. CONVERSION**<br><br>**(JURY TRIAL DEMANDED)** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Ratliff CPA Firm, PC ("Plaintiff or "Ratliff") brings this Class Action Complaint and Demand for Jury Trial (the "Complaint") on behalf of itself and those similarly situated against Defendant First-Citizens Bank & Trust Company (hereinafter "First-Citizens") and DOES 1 through 100, inclusive, to seek compensation from First-Citizens, which refuses to comply with the CARES Act that requires it to pay out of the compensation it received for processing PPP loans, for services Plaintiff and a large number of other agents rendered on behalf of recipients of Small Business Administration ("SBA") 7(a) emergency loans. For its class

action complaint, Plaintiff alleges as follows based upon its personal knowledge and upon information and belief, to include investigations conducted by its attorneys.

## NATURE OF THE ACTION

1.    In response to the shut-down of virtually every business across all non-essential industries due to COVID-19, the federal government has raced over the past few months to ease the impact of the shut-down on the U.S. economy.  In order to keep afloat small businesses, and to encourage those businesses to avoid massive worker layoffs and furloughs further damaging the economy, Congress decided to create an economic relief program to distribute money to small businesses.

2.    In order to distribute the money swiftly to small businesses, Congress decided to utilize the nation's financial institutions to take applications and distribute the funds that would be fully guaranteed by the federal government.  However, in order to avoid delay in disbursing funds to businesses, Congress decided that the financial institutions would not be required to verify the accuracy of the applications.  Instead, the burden to provide accurate information was put directly and solely on the small businesses submitting applications.

3.    The applications would need to be simple and the amount of the economic relief would be based on historical payroll information with specific limitations.  However, as the lenders would not be verifying the information, there would need to be a number of representations and certifications, and specific warnings because the failure to provide true and accurate information could subject the small business owner to five (5) years in prison and a $250,000 fine.

4.    In order for these small businesses to be able to make timely, truthful, and accurate applications, Congress understood that small businesses would need assistance from the nation's

professional accountants, tax preparers, financial advisors, attorneys, and other such agents normally relied upon by small businesses.

5.      On March 27, 2020, the United States Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (hereinafter the "CARES Act"). A signature piece of this landmark legislation is the SBA's Paycheck Protection Program ("PPP") which initially authorized up to $349 billion in forgivable loans to small businesses to cover payroll and other expenses ("PPP I").  After the initial funds quickly dried up, Congress added $310 billion additional dollars to the program ("PPP II").

6.      The PPP was designed to be a fast and straightforward, allowing business to apply through SBA-approved lenders and await approval.  Once approved, lenders would be compensated in the form of a generous origination fee paid by the federal government, with the requirement that the lender would be responsible for paying the fee owed to the loan applicant's agent (e.g., attorney or accountant).  Both the lender and the agents were specifically forbidden by the PPP from charging the small business borrower any amounts for the loan or the assistance in preparing the application for the lending.  The amount of the total compensation and the allocation between the lender and the agents assisting the borrowers in preparing the application was specifically laid out in the PPP.  For the majority of the loans (those under $350,000), the lender would receive an amount equal to 5% of the loan as compensation, and if the borrower used an agent such as a CPA or accountant, the lender was to pay to the agent an amount equal to 1% of the loan amount.  In other words, for the allocation of the compensation, 80% went to the lender and 20% went to the agent assisting the small business borrower.

7.      First-Citizens has more than five hundred (500) branches across nineteen (19) different states and regularly transacts business in the District.  First-Citizens was very active in

processing PPP I and PPP II loans, having created its own online portal for which small businesses and/or their agents were to apply for the PPP loan proceeds. In other words, compensation from the federal government to the lender and the borrower's agent was allocated as 80% to the lender and 20% to the CPA or attorney assisting the small business borrower.

8.      First-Citizens is one of the largest banks in the country, with over 500 individual branches spanning from the State of Washington to the State of Florida. First-Citizens holds over $39 billion in assets. First-Citizens reports that it has "helped nearly 23,000 businesses across our footprint secure loans totaling $3.2 billion through the Small Business Administration's Paycheck Protection Program."[1] The average PPP loan First-Citizens approved was thus worth approximately $139,130. Assuming a conservative average fee of four percent, First-Citizens has been allocated over $128 million in origination fees, from which they were required to pay the agents who assisted the borrowers in submitting applications.

9.      However, First-Citizens has apparently decided it does not need to complete the final step of the process and, based on information and belief, has refused to pay the agents who assisted PPP loan recipients with their applications. This practice seemed to be a deliberate scheme from the beginning as even though First-Citizens was required to pay agents that assisted in the application process, it did not set up a structure or ask any questions to determine whether borrowers utilized an agent in completing applications. It appears that this scheme was to claim ignorance of the existence of the agent as an excuse not to pay the agent its share of the compensation. This refusal is harming accountants, attorneys, and other agents who dropped everything (in the midst of tax season) to assist their customers in filling out these vital loan

---

[1]  *See FirstCitizens Bank SBA Paycheck Protection Program Update*, available at
https://www.firstcitizens.com/paycheck-protection-program (last visited May 28, 2020).

applications correctly and in compliance with the PPP, and who were specifically only allowed to be paid for these services out of the compensation paid to the lender.  First-Citizen's failure to pay agents is in blatant violation of PPP regulations stating that agent fees "will be paid by the lender out of the fees the lender receives from SBA."[2]

10.     These agents, including Plaintiff, have no other recourse for collecting fees for assisting borrowers on PPP loan applications because the PPP regulations delegate the responsibility for paying agents to the lenders *alone*.  And yet, First-Citizens has disregarded the regulations and refused to pay agents who assisted small businesses in receiving PPP funds.

11.     Plaintiff has been harmed by First-Citizens' practices. As a CPA firm that provides corporate and individual tax advice, accounting, payroll, and other small-business support functions, Plaintiff was naturally positioned to assist clients who submitted applications to Defendant and was then funded through the PPP program.  Plaintiff assisted at least one small business client who submitted an application to Defendant and was then funded through the PPP program.  Based on information and belief, First-Citizens has or will receivethe 5% compensation from that loan, but have not paid Plaintiff its 1% agent fee related to the loan.

12.     As a result of First-Citizen's acts and omissions, Plaintiff and a large number of others like it are being deprived of payment for their critical work in supporting their clients' PPP loan applications.  As such, Plaintiff brings this Class Action Complaint and Demand for Jury Trial in order to vindicate its rights and those of agents everywhere who are similarly situated, to force First-Citizens to account for its blatant violation of the PPP, and to pay agents their legally-mandated portion of the compensation.

## PARTIES

---

[2] SBA Interim Final Rule, Federal Register, Vol. 85, No, 73, first issued on April 2, 2020.

13.     Plaintiff Ratliff is a South Carolina Professional Corporation with its principal place of business in Mount Pleasant, South Carolina. Ratliff provides corporate and individual taxation advice to its clients and performs financial planning and consulting for both businesses and individuals in the local community. Ratliff meets the criteria to be a PPP Agent under the CARES Act.

14.     On information and belief, Defendant First-Citizens is a North Carolina corporation with its principal place of business in Raleigh, North Carolina, that provides, *inter alia*, banking services to individuals and businesses. On information and belief, First-Citizens conducts substantial business in this District either directly and/or through its subsidiaries and/or affiliates.

15.     When in this Complaint reference is made to any act of any Defendant, such shall be deemed to mean that officers, directors, agents, employees, or representatives of the Defendant named in this lawsuit committed or authorized such acts, or failed and omitted to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of the Defendant and did so while acting within the scope of their employment or agency.

16.     Plaintiff is unaware of the names, identities, or capacities of the Defendants sued as Does 1-100, but is informed and believes and thereon alleges that each such fictitiously-named defendant is acting as a lender and providing PPP loans to small businesses and is responsible in some manner for the damages and abridgement of rights described in this Complaint. Plaintiff will amend its Complaint to state the true names, identities or capacities of such fictitiously-named defendants when ascertained.[3]

---

[3] Plaintiff is aware that in South Carolina alone, there are 58,300 approved loans for a total of $5,643,833,539 to small businesses in this state. See U.S. Small Business Administration Paycheck Protection Program (PPP) Report,

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, as the proposed Class, (1) at least one member of the proposed Class, which consists of at least 100 members, is a citizen of a different state than Defendant; (2) the claims of the proposed Class Members exceed $5,000,000 in the aggregate, exclusive of interest and costs, and (2) none of the exceptions under that subsection apply to this action.

18.     Personal jurisdiction over Defendant is proper because Defendant transacts business in the State of South Carolina and a substantial number of the events giving rise to the claims alleged herein took place in South Carolina.

19.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under 85 Fed. Reg. 20816 § (4)(c) (hereinafter, the "PPP regulations").

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the alleged claims occurred in this District, including from work performed by Ratliff on behalf of business clients within this District, and Defendant marketed, promoted, and accepted applications for PPP loans in this District.

---

Approvals through 05/23/2020, https://home.treasury.gov/system/files/136/SBA-Paycheck-Protection-Program-Loan-Report-Round2.pdf (last accessed May 26, 2020)

## BACKGROUND

21.    The spread of COVID-19 was declared a pandemic by the World Health Organization ("WHO") on March 11, 2020.

22.    On March 13, 2020, President Donald Trump issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia."

23.    The Federal Government expressly recognized that with the COVID-19 emergency, "many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State and local public health measures that are being taken to minimize the public's exposure to the virus."[4]

24.    The economic fallout from COVID-19, and the national response to it, was immediate and enormous. As "stay at home" issues were ordered by states across the nation, countless businesses were forced by law to overhaul their business models, scale back their business dramatically, or shutter–either temporarily or permanently. Businesses were further harmed as the public began to avoid all public spaces. Furloughs and layoffs were rampant in the private sector.

25.    On March 25, 2020, in response to the economic damage caused by the COVID-19 crisis and the overwhelming public pressure that resulted from it, the U.S. Senate passed the Coronavirus Aid, Relief, and Economic Security, or CARES, Act. The CARES Act was passed by the House of Representatives the following day and signed into law by President Trump on

---

[4] *See Business Loan Program Temporary Changes; Paycheck Protection Program,* 13 CFR Part 120, Interim Final Rule ("SBA PPP Final Rule").

March 27, 2020. Amounting to approximately $2 trillion, the CARES Act was the single-largest economic stimulus bill in American history.

26.    Critically, the CARES Act created a $659 billion loan program for businesses with fewer than five hundred employees, the PPP.[5] The goal of the PPP was to provide American small businesses with eight weeks of cash-flow assistance, with a certain percentage forgivable if utilized to retain employees and fund payrolls. The loans are fully federally guaranteed and administered by the SBA.[6]

27.    The PPP loans operate more like grants if the recipient follows certain rules, including that at least 75 percent of the loan goes toward payroll.[7]  Businesses that follow the rules are permitted to submit a request to their SBA lender for total forgiveness. Otherwise, the loan matures in two years and carries a one percent interest rate.[8]

28.    The SBA was charged with creating the PPP implementing regulations. The SBA issued the first interim final rule ("Initial Rule") on April 2, 2020, allowing businesses to begin applying for PPP loans with all SBA lenders on April 3, 2020.

29.    An important piece of the PPP was that applications were to be processed and funded on a "first-come, first-served" basis—that is, the SBA was to process applications and distribute funds based on the order in which they were received. This made the SBA's list of approved lenders key gatekeepers in this process, which the lenders certainly understood. Because the PPP was to be administered only through SBA-approved lenders, and because

---

[5] The initial $349 billion in funding was all allocated within the span of thirteen (13) days, stopping many small businesses from taking advantage of the PPP. Accordingly, Congress approved an additional $310 billion in funding through the Paycheck Protection Program and Health Care Enhancement Act, signed by President Trump on April 24, 2020.
[6] Small Bus. Admin., Docket No. SBA-2020-0015, 13 CFR Part 120, Paycheck Protection Program 3245-AH34, Interim Final Rule, 85 Fed. Reg. 20814 § (2)(o) (Apr. 15, 2020)
[7] 85 Fed. Reg. 20812 § (2)(e); id. at 20813 § (2)(o).
[8] Id. at 20813 § (2)(j).

applicants were applying for funds from the single pot allocated for the program, submitting an accurate application for a loan through the SBA-approved lender as quickly as possible was critical.

30.     Congress added an incentive for the SBA-affiliated lenders, knowing they would be inundated with PPP loan applications:  for each loan processed and approved, the bank would receive an origination fee of five percent for loans up to $350,000; three percent for loans between $350,000 and $2 million; and one percent for loans between $2 million and $10 million.[9]

31.     With similar incentives in mind, Congress and the SBA also carved out a specific benefit for the countless accountants, attorneys, and advisors who would need to lead or assist their clients in preparing and filing PPP loan applications.  These individuals and entities are referred to as "Agents" in the CARES Act and PPP implementing regulations.

32.     As explained in the PPP Information Sheet provided for "lenders," the SBA states that '[a]n 'Agent' is an authorized representative and can be: an attorney; an accountant; a consultant; someone who prepares an applicant's application for financial assistance and is employed and compensated by the applicant; someone who assists a lender with originating, disbursing, servicing, liquidating, or litigating SBA loans; a loan broker; or any other individual or entity representing an applicant by conducting business with the SBA."[10]

33.     In addition, the SBA Regulations provide that "Agent fees **will** be paid out of lender fees.  The lender will pay the agent.  **Agents may not collect any fees from the applicant**.  The total amount that an agent may collect from the lender for assistance in preparing an

---

[9] Id.

[10] U.S. Department of the Treasury, Small Business Paycheck Protection Program Information For Lenders, Originally posted on March 31, 2020, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed May 26 2020)

application for a PPP" loan is as follows ("Agent Fees"): one percent (1%) for loans up to $350,000; 0.50% for loans between $350,000 and $2 million; and 0.25% for loans between $2 million and $10 million."[11]

34.    Within this context, Congress and the SBA set up a straightforward system for the disbursement of PPP loan funds where the applicant is assisted by an Agent: (i) the Agent prepares the application and/or necessary supporting application documents for the client; (ii) the client or Agent applies for the PPP loan through the lender; (iii) the lender submits the application to the SBA; (iv) the SBA approves the loan and sends the client the money through the lender, and eventually pays the lender's origination fee; and (v) the Agent submits the request for fee payment to the lender with the Agent's fee based upon (a) the work performed for the client and (b) the caps on agent fees provided by the SBA's PPP regulations.

35.    Unfortunately, based on information and belief, First-Citizens is refusing to pay the fees of Agents for their assistance in providing an accurate and truthful application for funding.

36.    Upon information and belief, this refusal is a company-wide policy. Further, based on the fact that First-Citizens set up the application process without even asking borrowers if they utilized an agent to assist them, suggests that First-Citizens did not want to have any record of the Agent information in its files.

37.    This policy of refusal to pay Agents the "Agent Fees" due to them, and that *only* the lenders are authorized to pay, stands as an immediate threat to these Agents' abilities to receive payment. In the midst of an unprecedented economic/pandemic crisis, this policy represents short-sighted profit-padding at best, and blatantly illegal conduct, at worst.

---

[11] Id. (emphasis added); see also 85 Fed. Reg. 20816 § (4)(c)

38.     Refusing to pay Agent Fees is also inconsistent with agreements First-Citizens made in order to become an approved PPP lender.  Specifically, based on information and belief, First-Citizens was required to fill out and sign the "CARES Act Section 1102 Lender Agreement" for each loan.    This agreement requires each putative PPP lender to certify, under penalty of perjury, that it (i) "is in compliance and will maintain compliance with all applicable requirements of the [PPP], and PPP Loan Program Requirements[,]" (ii) will "service and liquidate all covered loans made under the Paycheck Protection Program in accordance with PPP Loan Requirements[,] and (iii) will "close and disburse each covered loan in accordance with the terms and conditions of the PPP Authorization and PPP Loan Requirements."[12]

39.     To the extent First-Citizens had to certify, at any point, that it would follow the PPP's regulations in making PPP loans, it was not being truthful.  First-Citizens' policy to refuse to pay third-party agents fees directly violates the PPP's implementing regulations.

40.     It is pursuant to these representations that First-Citizens was able to process over 23,000 PPP applications worth over $3.2 billion in funding, an average loan of approximately $140,000.  Assuming a conservative average fee of four percent, First-Citizens has been allocated over $128 million in origination fees, from which it was required to pay agents.

41.     Ultimately, despite knowing that they were required to pay Agents a percentage of their PPP loan origination fees if an Agent assisted an applicant in preparing and submitting the application, First-Citizens elected not to ask borrowers whether they utilized an "Agent" (or purposely left off this inquiry when developing its application procedures) to assist them in the

---

[12] U.S. Small Business Administration CARES Act Section 1102 Lender Agreement, https://www.sba.gov/sites/default/files/2020-04/SBA%20Form%203506%20CARES%20Act%20Section%201102%20Lender%20Agreement%2004022020.pdf (last accessed May 26, 2020)

application process and have not paid Plaintiff or similarly situated Agents compensation from funded PPP loans.

## **FACTUAL ALLEGATIONS**

42.      Ratliff is a CPA firm with locations in Mount Pleasant, South Carolina; Sumter, South Carolina; and Mt. Prospect, Illinois. John W. Ratliff, III, the sole owner of Ratliff, has been a professional accountant since 1975 and has provided public accounting services to clients for thirty-six (36) years.  Ratliff currently has approximately 1,000 clients that it services between its three locations. Upon information and belief, approximately 50 are small businesses and/or sole proprietorships. Ratliff, knowing that the COVID-19 crisis would significantly impact clients' businesses, sought to obtain PPP loans through various SBA-approved lenders on behalf of clients.

43.      Ratliff's professionals spent considerable time familiarizing themselves with the CARES Act and the related SBA Regulations, in particular (a) Section 1102, which permits the SBA to guarantee 100% of Section 7(a) loans under the PPP and (b) Section 1106 of the Act, which provides forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

44.      In or about March, April and May, 2020, Ratliff assisted many clients in the gathering and analysis of their documents, as well as the calculations and preparation of the loan applications.

45.      Based on the SBA Regulations, Ratliff understood that it was not allowed to charge clients a fee relating to the application process.  The agents were only allowed to receive compensation from the agents' share of the estimated $20 billion in fees that the Federal Government paid the Lenders for originating the PPP loans.

46.     For its clients, Ratliff had the primary role in calculating the payroll information needed for the application, and providing the clients' accounting information, advice, documentation in support of the PPP loan application, and will have ongoing responsibility for advising on the forgiveness of the PPP loan.

47.     Ratliff provided all of these services to two clients (hereinafter, "Client BP" and "Client JM") who obtained PPP loans from First-Citizens. Client BP obtained a PPP loan from First-Citizens in the amount of $67,300 on April 20, 2020. Based upon information and belief, First-Citizens was paid or will be paid, an origination fee of $3,365, of which Ratliff is entitled to $637.00 (1% of total loan amount) of that fee for their work as the agent of the borrower in submitting the application and documentation. Client JM applied for and obtained a PPP loan from First-Citizens on April 15, 2020 in the amount of $24,939. Based upon information and belief, First-Citizens was paid or will be paid, an origination fee of $1,246.95, of which Ratliff is entitled to $249.39 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

48.     First-Citizens did not comply with the SBA Regulations because it has not paid Ratliff any agent fees despite awarding PPP loans to Ratliff's clients for whom Ratliff acted as a PPP Agent. Instead, First-Citizens retained all of the Agent Fees for itself. Ratliff asked First-Citizens about payment of its fees as PPP Agent, to which First-Citizens responded that "the bank made the decision [it] would not pay agent fees for the PPP loans."

49.     As a result of First-Citizens' unlawful and unfair actions, Plaintiff and the Class have suffered financial harm by being deprived of the statutorily-mandated compensation for the professional services provided to clients in assisting them with obtaining PPP loans.

## CLASS ALLEGATIONS

50.    As noted above, Plaintiff brings this action on behalf of itself and all others similarly situated as a nationwide Class, defined as follows:

> All persons and businesses who served as an agent in relation to, and provided assistance to a client in relation to, the preparation and/or submission of a client's PPP loan application to First-Citizens, which resulted in a loan being funded by First-Citizens under the PPP.
>
> **South Carolina Subclass.**    All persons and businesses in South Carolina who served as an agent in relation to, and provided assistance to a client in relation to, the preparation and/or submission of a client's PPP loan application to First-Citizens which resulted in a loan being funded by First-Citizens under the PPP.

51.    Excluded from this Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

52.    Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with Plaintiff's motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

53.    *Numerosity*: The Class is composed of hundreds of Agents ("Class Members"), whose joinder in this action would be impracticable. The disposition of their claims through this class action will benefit all Class Members, the parties, and the courts.

54.    *Commonality and Predominance*: There is a commonality in questions of law and fact affecting the Class. These questions of law and fact predominate over individual questions affecting individual Class Members, including, but not limited to, the following:

a.    Whether First-Citizens' conduct violates the CARES Act and/or its implementing regulations;

b.    Whether First-Citizens is required to compensate Plaintiff out of the origination fees obtained from SBA through the PPP;

c.    Whether Plaintiff is entitled to compensation by First-Citizens for Plaintiff's work assisting in its client's PPP loan application;

d.    Whether First-Citizens' conduct was willful and knowing;

e.    Whether First-Citizens' submission of completed Form 2484 constituted an agreement;

f.    Whether First-Citizens breached that agreement;

g.    Whether First-Citizens' conduct was pursuant to a company-wide policy or policies; and

h.    Whether First-Citizens' conduct constitutes unjust enrichment.

55.    *Superiority*: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable.  The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by First-Citizens' actions.  Thus, it would be difficult and not economical for the individual members of the Class to obtain effective relief from First-Citizens' misconduct.  Even if members of the Class could

sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

56.    *Typicality*: Plaintiff's claims are typical of, and are not antagonistic to, the claims of all Class Members, in that Plaintiff and members of the Class sustained damages arising out of First-Citizens' uniform wrongful conduct.

57.    *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel with substantial experience in litigating complex cases, including class actions.  Plaintiff's claims are representative of the claims of the other members of the Class.  That is, Plaintiff and members of the Class sustained damages as a result of First-Citizens' uniform conduct.  Plaintiff also has no interests antagonistic to those of the Class, and First-Citizens has no defenses unique to Plaintiff.  Both Plaintiff and its counsel will vigorously prosecute this action on behalf of the Class and have the financial ability to do so.  Neither Plaintiff nor counsel have any interest adverse to other Class Members.

58.    *Ascertainability*: Plaintiff is informed and believes that First-Citizens keeps extensive computerized records of its loan applications through, *inter alia,* computerized loan application systems and federally-mandated record-keeping practices.  Defendant has one or more databases through which all of the borrowers may be identified and ascertained, and it maintains contact information, including electronic mail and mailing address.  From this information, the existence of the Class Members (i.e., borrowers' Agents) can be determined,

and thereafter, a notice of this action can be disseminated in accordance with due process requirements.

59.    First-Citizens has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**FOR A FIRST CAUSE OF ACTION**
**On Behalf of the Class**
**(Declaratory Judgment)**

60.    Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

61.    Plaintiff and the Class represent individuals who are "Agents" as defined by the SBA regulations for the PPP.

62.    Plaintiff and the putative Class have assisted clients with the process of preparing applications, any applying for, PPP loan funds. First-Citizens, despite the clear command of the SBA's PPP regulations, has refused to make these payments. An actual controversy has arisen between Plaintiff and the Class, on one hand, and First-Citizens on the other, wherein First-Citizens denies by its refusal to pay that it obligated to pay Plaintiff's and the Class' "Agent" fees pursuant to PPP regulations.

63.    Plaintiff and the Class seek a declaration, in accordance with the SBA regulations and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that First-Citizens is obligated to set aside money to pay, and pay third-party agents—within the SBA-approved limits—for the work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan.

**FOR A SECOND CAUSE OF ACTION**
**On Behalf of the Class**
**(Breach of Contract, Third Party Beneficiary)**

64.     Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

65.     On information and belief, First-Citizens entered into an agreement with the SBA in connection with the loans funded in the PPP.

66.     The agreements required that First-Citizens adhere to all PPP rules and regulations and incorporate these requirements by reference. First Citizens and the SBA understood that Agents involved in the preparation and submission of the PPP loan applications would need to be compensated.

67.     The SBA's PPP regulations specifically require that PPP lenders pay the fees of any Agent that assists with the PPP loan application process, within limits.

68.     First-Citizens understood that Plaintiff and the Class were intended beneficiaries in this agreement. Nevertheless, First-Citizens has refused to live up to its end of the bargain and has uniformly refused to pay Agent fees to Plaintiff and the Class.

69.     By refusing to pay Agent fees in accordance with the SBA regulations, First-Citizens is violating the terms of its agreement, thereby damaging Plaintiff and the Class. Plaintiff and the Class thus ask this Court to award it damages sufficient to make it whole, and compensate it for work it did in preparing client's PPP loan application for loans that were funded, consequential damages, and all other damages available at law.

### FOR A THIRD CAUSE OF ACTION
**On Behalf of the Class**
**(Violation of the South Carolina Unfair Trade Practice Act)**

70.     Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

71.     Upon information and belief, First-Citizens' actions constitute an unfair and/or deceptive trade practice in the conduct of trade or commerce, in violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, *et. seq*.

72.     The SBA's PPP regulations specifically provide that "lenders" who provide loans under the program will be responsible for paying Agent fees, within prescribed limits.

73.     First-Citizens has uniformly refused to pay these fees to Plaintiff and the Class. As a result, First-Citizens has engaged in unlawful conduct that has cost Plaintiff and the Class millions of dollars in fees, collectively.

74.     First-Citizens has also engaged in "unfair" business practices through this conduct, as well as set forth above.

75.     Upon information and belief, the unfair trade practices have an adverse impact on the public interest and the Class and members of the general public have been and may continue to be irreparably harmed.

76.     Upon information and belief, the SCUTPA violation was willful, as First-Citizens knew or should have known their conduct was a violation of the SCUTPA.

77.     As a result of such unlawful and illegal conduct, Plaintiff and other Class Members have suffered damages in numerous and substantial ways.

78.     As a direct and proximate result of First-Citizen's violations of the SCUTPA, Plaintiff has been damaged, and therefore, is entitled to treble damages, plus attorneys' fees and costs for prosecuting this action.

<u>**FOR A FOURTH CAUSE OF ACTION**</u>
**Against All Defendants**
**(Unjust Enrichment)**

20

79.    Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

80.    Unjust enrichment, or restitution, may be alleged where a defendant unjustly obtains and retains a benefit to the plaintiff's detriment, where such retention violates fundamental principles of equity, justice, and good conscience.

81.    Here, First-Citizens has obtained millions of dollars in benefits in the form of PPP loan origination fees. A portion of those fees were to be paid to agents, like and including Plaintiff, who assisted in their clients' PPP loan applications. But First-Citizens is refusing to pay those fees, in contravention of PPP regulations.

82.    Principles of justice, equity, and good conscience demand that First-Citizens not be allowed to retain these agent fees. First-Citizens has fallen short in its duty as a lender, and during a crisis no less. As a result, Plaintiff and the putative Class have been unable to obtain the agent fees due to them.

83.    Accordingly, First-Citizens must disgorge the portion of any and all PPP origination fees that it has retained to the extent they are due to Plaintiff and the putative Class in their capacities as agents.

**FOR A FIFTH CAUSE OF ACTION**
**On Behalf of the Class**
**(Conversion)**

84.    Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

85.    Under the SBA regulations, Plaintiff and the Class, as PPP agents, have a right to Agent fees that must be paid from the amount of lender fees provided to First-Citizens for processing Plaintiff's client's PPP loan applications.

86.     The SBA regulations state that "[a]gent fees *will* be paid out of lender fees" and provide guidelines on the amount of agent fees that should be paid to the PPP Agent, based upon the size of the PPP loan.

87.     Additionally, the SBA regulations require that lenders, not loan recipients, pay the agent fees. The SBA regulations unequivocally state that "[a]gents may not collect fees from the applicant."

88.     Plaintiff and the Class assisted clients with applying for PPP loans, including gathering and curating information necessary for completing PPP loan applications that were subsequently funded. Due to Plaintiff's and the Class's efforts, their clients were awarded PPP loans from First-Citizens. As such, Plaintiff has a right to immediate possession of the Agent fees.

89.     Although Plaintiff is entitled to agent fees under the SBA regulations, First-Citizens has refused to provide those fees to Plaintiff and the class, thus keeping the Agent fees that were paid to it for passing on to the agents. By withholding these fees, First-Citizens has maintained wrongful control over Plaintiff's property inconsistent with Plaintiff's entitlements under the SBA regulations.

90.     First-Citizens has committed civil conversion by retaining monies owed to Plaintiff and Class members.

91.     Plaintiff and the Class have been injured as a direct and proximate cause of First-Citizens' misconduct. Plaintiff seeks recovery from First-Citizens in the amount of the owed agent fees, and all other relief afford under the law.

## DEMAND FOR JURY TRIAL

92.     Plaintiff demands a trial by jury on all issues to the fullest extent permitted under applicable law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ratliff, individually and on behalf of the Class, respectfully prays for the following relief:

A.  An order certifying the Class as defined above, appointing Plaintiff as the representative of the Class, and appointing its counsel as Class Counsel;

B.  An order declaring that First-Citizens' actions, as set out above, constitute unjust enrichment, conversion, breach of contract on behalf of third-party beneficiary, violate the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et. seq*., and violate the SBA's PPP regulations;

C.  An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law and caused by First-Citizens' conduct, including without limitation, actual damages for past, present and future expenses caused by First-Citizens' misconduct, lost time and interest, and all other damages suffered, including any damages likely to be incurred by Plaintiff and the Class;

D.  An award of reasonable litigation expenses and attorneys' fees;

E.  An award of pre- and post-judgement interest, to the extent allowable;

F.  The entry of an injunction and/or declaratory relief as necessary to protect the interests of the Plaintiff and the Class; and

G.  Such other further relief that the Court deems reasonable and just

Respectfully submitted,


By:  ___ */s/ Michael D. Wright*___

Richard A. Harpootlian (Fed I.D. No.1730)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com


Mark C. Tanenbaum (Fed I.D. No. 4071)
MARK C. TANENBAUM, P.A.
1017 Chuck Dawley Blvd., Suite 101
Mt. Pleasant, SC 29464
Telephone: (803) 577-5100
Facsimile: 843-722-4688
mark@tanenbaumlaw.com

Vincent A. Sheheen (Fed I.D. No. 7016)
Michael D. Wright (Fed I.D. No. 11452)
SAVAGE, ROYALL & SHEHEEN, L.L.P.
P.O. Drawer 10
Camden, S.C. 29021
Telephone: (803) 432-4391
Facsimile:  (803) 425-4812
mwright@thesavagefirm.com


Richard D. McCune (*pro hac vice* motion forthcoming)
Michele M. Vercoski (*pro hac vice* motion forthcoming)
MCCUNE WRIGHT AREVALO LLP
18565 Jamboree Road, Suite 550
Irvine, California 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275
Email: rdm@mccunewright.com


Attorneys for Plaintiff and Putative Class

May 29, 2020